## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

HOSPICE SAVANNAH, INC.,
a Georgia Not for Profit Corporation,

        Plaintiff,

        v.

SYLVIA MATHEWS BURWELL,
Secretary of the United States Department
of Health and Human Services,

and

ANDREW SLAVITT,
Acting Administrator for the Centers for
Medicare & Medicaid Services,

and

PALMETTO GBA,

        Defendants.

Case No. _____

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF**

Plaintiff Hospice Savannah, Inc. ("Hospice Savannah" or "Plaintiff"), a not for profit organization providing hospice service to terminally-ill patients and their families throughout Chatham, Bryan, Effingham, Liberty, and Long counties, hereby applies to this Court for injunctive relief and mandamus and as grounds for this Complaint, states as follows:

### INTRODUCTION

1.      This is a civil action for a Temporary Restraining Order, Preliminary Injunction and Permanent Injunction to prevent Defendants from putting Hospice Savannah out of business and, thus, preventing Hospice Savannah from fulfilling its charitable hospice mission, based on a billing dispute. The billing dispute is premised entirely on a difference of clinical opinion between unidentified reviewers who have relied on a strictly paper record to overturn the medical

judgments and certifications of medical necessity of hospice services made by attending physicians in consultation with their patients. To make matters worse, Defendants rely on a flawed, untested, and invalid statistical methodology to inflate $127,539.17 in alleged overpayments to a demand of more than $8,600,000. The medical review and statistical sampling upon which this demand is based were conducted by bounty hunters—entities that typically delegate the task of complex medical review to mid-level professions who are identified neither by name nor professional designation. Despite Hospice Savannah's full compliance with federal requirement that patients' terminal prognoses be certified by at least one, and up to two, physicians in order to access the hospice benefit, it is not apparent whether these contractors provided any physician review in overruling the clinical judgment of the patients' attending physicians and Hospice Savannah's board-certified physician medical director regarding the medical prognoses of these patients.. These contractors' determinations routinely are reversed once providers reach the first level of impartial review—an Administrative Law Judge ("ALJ") hearing. There is no allegation by Defendants that the billing dispute is the result of any fraud or artifice on the part of Hospice Savannah. In fact, all claims in dispute were supported by all requisite certifications and re-certifications of medical necessity reflecting the clinical judgment of the patients' attending physicians and Hospice Savannah's physician medical director.

2.      Hospice Savannah is entitled to prompt administrative and judicial review of the billing dispute, and Hospice Savannah is likely to prevail with respect to all or most of the issues within the billing dispute, including the medical necessity determinations and the invalidity of the extrapolation process used by Defendants. In fact, the reversal rate of hospice claim denials at the ALJ level exceeds a staggering 70% (including a 62% "fully favorable" rate and an 8% "partially favorable" rate in favor of hospices). Indeed, even if Hospice Savannah succeeds only

in invalidating the purported statistical methodology (which contains a number of flaws and has never been peer-reviewed), the demand would decrease from over $8,600,000 to $127,539.17 (plus $111,525.46 from an earlier audit that suffers the same errors). However, the current administrative backlog at the HHS Office of Medicare Hearings and Appeals ("OMHA") will preclude Hospice Savannah from receiving its first unbiased review before an impartial ALJ for at least another three to five years, rather than within 90 days as required by law. In the meantime, while Hospice Savannah awaits its first fair, impartial, and unbiased review, Defendants intend to invoke self-help and to recoup 100% of Hospice Savannah's future Medicare payments (approximately $700,000 per month), even though the services to which the recouped payments relate are not at issue. The first month's threatened recoupment alone far exceeds the amount of any overpayment determination that is likely to be upheld through administrative and judicial review. (Even if Hospice Savannah succeeds only in invalidating the purported statistical methodology, the demand would be reduced to less than $240,000, or about one-third of the amount Defendants seek to recoup in the first month alone.) Moreover, because Medicare payments represent 80% of Hospice Savannah's total revenues, this premature and excessive recoupment will immediately—on the first month—destroy Hospice Savannah's ability to fulfill its charitable mission, will force Hospice Savannah out of business, and, ultimately, will preclude Hospice Savannah from ever receiving the unbiased administrative and judicial review that it seeks and to which it is entitled.

3.  Hospice Savannah does not ask this Court to usurp the power of the ALJ to decide any issue with respect to the billing dispute nor of CMS to review the ALJ's decision. Indeed, Hospice Savannah is vigorously challenging the billing dispute through the administrative appeals process as expeditiously as the ALJ can accommodate, and Hospice Savannah fully

anticipates prevailing on all or most of the claims at issue. Hospice Savannah simply requests that this Court maintain the status quo pending completion of the administrative appeals process because, without such injunctive relief, Hospice Savannah (and its patients) will be irreparably harmed before any meaningful opportunity for the administrative review and judicial review to which it is entitled.

4.     Hospice Savannah has addressed this matter to Defendants and offered Defendants the opportunity to act on Hospice Savannah's request to defer recoupment (or to reduce it to a level that is sustainable for Hospice Savannah) until after Hospice Savannah has been provided the impartial and unbiased ALJ hearing to which it is entitled. However, Defendants have declined to defer recoupment (or to reduce it to a level that is sustainable for Hospice Savannah) and have instead offered only an extended repayment plan that far exceeds Hospice Savannah's ability to pay. Accordingly, Hospice Savannah comes to this Court as a last resort, only after first presenting and channeling this matter to Defendants and having its request for deferral of recoupment denied.

5.     Defendants' invocation of self-help with respect to the billing dispute without providing Hospice Savannah the prompt administrative hearing demanded by statute violates Hospice Savannah's due process rights. If Hospice Savannah is deprived of its Medicare payments while its billing dispute is stuck in the backlog of claims pending before the OMHA, Hospice Savannah will be irreparably harmed through the destruction of its goodwill and its business and certain closure of its facility. Additionally, its current terminally-ill patients and their families will be forced to find a new hospice in the midst of one of the most difficult times in their lives, and terminally-ill patients and their families in the Savannah area would be

deprived of the high-quality hospice services that Hospice Savannah provides. Moreover, Hospice Savannah's more than 200 full-time and part-time staff would be out of work.

6. Hospice Savannah has no adequate remedy at law, and seeks only to preserve the status quo pending the outcome of an administrative hearing. Hospice Savannah therefore seeks a Temporary Restraining Order and an injunction preventing the Defendants from recouping any disputed claims until Hospice Savannah has been afforded a hearing before an impartial and unbiased ALJ.

## PARTIES

7. Hospice Savannah is a Georgia not-for-profit organization founded in 1979 whose charitable mission is to provide hospice service to patients and their families throughout Chatham, Bryan, Effingham, Liberty, and Long counties. Hospice Savannah is the oldest hospice provider in the Coastal Empire. Hospice Savannah currently fulfills its mission of providing hospice services to approximately 200 terminally-ill patients and their families, through its more than 250 volunteers and more than 200 full-time and part-time staff.

8. Hospice Savannah's Board of Directors is comprised of community leaders who volunteer their time and expertise without compensation.

9. Hospice Savannah participates in the Medicare program pursuant to a provider agreement with CMS and applicable federal statutes and regulations.

10. Defendant Sylvia Mathews Burwell ("Secretary"), sued in her official capacity only, is Secretary of Health and Human Services ("HHS"), an agency of the United States government. As Secretary, she is responsible for administering the Social Security Act, 42 U.S.C. §§ 301, et seq., and in particular the Medicare Act, 42 U.S.C. §§ 1395, et seq.

11. Defendant Andrew Slavitt, sued in his official capacity only, is the Acting Administrator for CMS (the "Administrator").

12.     Secretary Burwell has delegated to the Administrator substantial responsibility for administering the Medicare Act.

13.     Defendant Palmetto GBA is a Medicare Administrative Contractor ("MAC"). It is the government contractor responsible for processing Medicare claims and making payments to Hospice Savannah and implementing any directive to suspend or recoup Medicare payments.

## JURISDICTION AND VENUE

14.     This action arises under the Social Security Act, 42 U.S.C. §§ 301, et seq., implicating the Medicare Act, 42 U.S.C. §§ 1395 et seq., as well as the Fifth Amendment to the United States Constitution.

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1361 (mandamus), 28 U.S.C. § 1651 (all writs act), 42 U.S.C. § 405, 42 U.S.C. § 1395ii; and under the Court's general equity powers. Hospice Savannah is also entitled to the judicial relief it seeks pursuant to the Administrative Procedure Act, 5 U.S.C. § 705.

16.     Although Hospice Savannah is challenging the billing dispute through the administrative process, the ALJs of CMS have no authority to issue an injunction, and lack the power to maintain the status quo pending a final decision. Accordingly, there is no administrative mechanism through which Hospice Savannah can obtain the relief that it seeks here, which is solely to defer recoupment of the amounts at issue in the billing dispute until after Hospice Savannah has had the opportunity for a hearing before a fair and impartial ALJ.

17.     Despite the absence of any formal administrative mechanism to request deferral of recoupment, Hospice Savannah made such a request to Defendants and attempted to present and channel this dispute through the agency. However, Defendants refused to defer recoupment to allow completion of administrative review and, instead, proposed an extended repayment schedule that required payments beyond Hospice Savannah's ability to pay. By all indications,

this is the final decision of Defendants on the issue of pre-hearing recoupment. Accordingly, this matter is ripe for judicial review.

18.     Additionally, this Court has jurisdiction over this action under 28 U.S.C. § 1331 pursuant to the "no review" exception to the usual requirement of exhaustion of administrative remedies. Exhaustion of administrative remedies under the Medicare Act is not required where exhaustion would mean "no review at all" or "the practical equivalent of a total denial of judicial review."

19.     If this court does not issue injunctive relief, Hospice Savannah and its patients will have no review at all before irreparable harm takes place, and once the irreparable harm takes place, the theoretically available administrative remedies will be too late and of no value.

20.     Due to the amounts that Defendants seek to recoup and the lengthy delay before a hearing can be held before an impartial ALJ, at least three to five years in the future, Hospice Savannah is facing the practical equivalent of a total denial of administrative or judicial review because the pre-hearing recoupment would certainly put Hospice Savannah out of business long before any ALJ hearing takes place.

21.     Hospice Savannah has not already gone out of business. Hospice Savannah is not seeking damages in this action for events that have already occurred. Hospice Savannah does not seek this Court's determination of the merits of the underlying billing dispute. This action is solely about Hospice Savannah's survival and ability to continue its charitable mission of providing hospice services to terminally-ill patients and their families in the Savannah community, and whether the government can engage in self-help recoupment that would financially ruin Hospice Savannah when (a) the purported overpayment determinations (the individual medical necessity determinations as well as the extrapolation methodology) made by

entities with a financial incentive to overstate overpayments are likely to be overturned by an ALJ and (b) the government is unable to provide Hospice Savannah with timely access to an ALJ as it is required to do by statute.

22.     Further, this Court has jurisdiction over this action under 28 U.S.C. § 405 pursuant to the "waiver" exception to the usual requirement of exhaustion of administrative remedies. Hospice Savannah has appealed and requested a hearing before an ALJ to demonstrate inter alia (a) that all challenged hospice services, which were provided only after first securing all requisite certifications and re-certification from the patients' attending physicians and Hospice Savannah's medical director, were appropriately billed and (b) that Defendants' attempts to convert an alleged $127,539.17 overpayment into a demand of over $8,600,000 is not based on any statistically valid methodology. Exhaustion of administrative remedies under the Medicare Act is not required where the plaintiff's interest in having a particular issue resolved promptly is so great that the requirement is considered waived. Hospice Savannah's interest in having its claims, resolved promptly is so great that the requirement should be considered waived.

23.     Hospice Savannah's request for an injunction based on the claims asserted herein, is "collateral" to Hospice Savannah's substantive claims in connection with the billing dispute. Indeed, Hospice Savannah does not ask this Court to resolve the merits of the underlying billing dispute in this action. It merely requests that this Court preclude Defendants from engaging in self-help recoupment based on preliminary and disputed determinations until after Hospice Savannah has been afforded the opportunity to obtain a ruling from an impartial and unbiased ALJ.

24. More importantly, the self-help remedy of recoupment that Defendants intend to implement years in advance of Hospice Savannah's first opportunity to present its case to an impartial and unbiased ALJ would harm Hospice Savannah irreparably, and the facts of this case give rise to a sufficient threat of irreparable harm so as to justify waiver of the administrative exhaustion requirement. Recoupment of 100% of Hospice Savannah's Medicare payments would result in immediate irreparable harm to Hospice Savannah, through destruction of its goodwill and its business and closure, and also would harm the community that Hospice Savannah serves. Hospice Savannah could not obtain full relief at a post-recoupment hearing.

25. The irreparable harms alleged in this Complaint would ensue from subjecting Hospice Savannah to self-help recoupment remedies relating to a billing dispute on which Hospice Savannah is likely to substantially prevail before Hospice Savannah is afforded its first opportunity for hearing before a fair and impartial ALJ—a backlogged process that currently takes at least three to five years, rather than the 90 days demanded by statute. Thus, an injunction would protect the rights of Hospice Savannah, its patients, their families, and the Savannah community pending completion of the full administrative process. In light of the serious and substantial threat of unwarranted and irreparable harm to Hospice Savannah, its residents, and their families, Hospice Savannah's interest in having a determination of its right to injunctive relief is so great that deference to CMS's desire to deprive Hospice Savannah and its residents of protection pending exhaustion of the administrative process is inappropriate.

26. Without protection of injunctive relief, and in light of the backlog of at least three to five years to obtain a hearing before an ALJ, Hospice Savannah would have no practical opportunity to ever present its case to an impartial ALJ. Long before Hospice Savannah could even get to a hearing before an ALJ, much less have an opportunity to complete the

9

administrative process, and to appeal any adverse decision to the federal courts, Hospice Savannah would have been deprived of years of Medicare revenues and would already be closed, and all of its patients and their families would have been forced to search elsewhere for hospice services.

27.     Additionally, under the Mandamus Act, the district courts have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff. This action is brought to compel the Secretary of the Department of Health and Human Services, an officer of the United States, to perform duties owed to Hospice Savannah, namely to provide a timely hearing before a fair, unbiased, and impartial ALJ, and thus provides a basis for jurisdiction.

28.     The exhaustion provisions of the Medicare Act (42 U.S.C. § 1395ii) and Social Security Act (42 U.S.C. § 405(h)) apply only to actions brought under 28 U.S.C. §§ 1331 and 1346, and do not affect a mandamus action brought under 28 U.S.C. § 1361. A federal district court has mandamus jurisdiction in cases against the Secretary of Health and Human Services with respect to actions under the Medicare statute.

29.     Under the Medicare Act, the Defendants have a clear duty to comply with their statutory obligation to provide a hearing before an ALJ within 90 days. Thus, Hospice Savannah has a clear right to an injunction prohibiting recoupment and ordering Defendants to provide a timely hearing before an ALJ.

30.     Mandamus jurisdiction under 28 U.S.C. § 1361 permits flexibility in remedy, including injunctive relief. CMS's administrative remedies are not capable of affording full relief as to the subject matter in question, as they do not include either injunctive relief or any way to

redress the irreparable harm that Hospice Savannah, its residents, and their families will suffer absent injunctive relief.

31. This Court has jurisdiction under 5 U.S.C. § 705, as a "reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."

32. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) and (e) and 5 U.S.C. § 703.

## MEDICARE AND MEDICAID PROGRAM REQUIREMENTS

### A. The Medicare Hospice Benefit

33. The Medicare program was enacted in 1965 under Title XVIII of the Social Security Act to provide health insurance primarily to individuals sixty-five years of age and older. Social Security Amendments of 1965, Pub. L. 89-97, 79 Stat. 286 (1965) (codified as amended at 42 U.S.C. §§ 1395-1396v). The program's main objective is to ensure that its beneficiaries have access to health care services. *Id.* at 286. Hospice Savannah qualifies as a provider of hospice services under Title XVIII, also known as the Medicare Act.

34. The Medicare program is divided into four "parts" that cover different services. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

35. Congress established the Medicare hospice benefit in 1983 to provide palliative care and support services for terminally-ill patients. *See* Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §122, 96 Stat. 324, 356 (1982). The Medicare hospice benefit is designed to provide comfort, pain relief and emotional and spiritual support, rather than curative care. 48 Fed. Reg. 56008, 56008 (Dec. 16, 1983).

36.     To be eligible for the Medicare hospice benefit, a patient must be terminally ill and have elected the Medicare hospice benefit in lieu of treatment of his or her terminal illness through traditional curative means. *See* 42 C.F.R. §§ 418.22, 418.24.

37.     A patient is terminally ill if he is certified by the certifying physicians as having a "medical prognosis that the individual's life expectancy is 6 months or less" if the illness runs its normal course. 42 U.S.C. §§ 1395f(a)(7)(A), 1395x(dd)(3)(A); 42 C.F.R. § 418.22.

38.     Initial certifications of a terminal illness may only be made on the basis of the clinical judgment of the two physicians authorized to do so by the statute: (1) the hospice's medical director or another hospice physician; and, (2) the patient's attending physician, if the patient has one. 42 U.S.C. §§ 1395f(a)(7)(A), 1395x(dd)(3)(A); 42 C.F.R. § 418.22.

39.     The patient's "attending physician" is "the physician . . . who the [patient] identifies as having the most significant role in the determination and delivery of medical care to the individual at the time the individual makes an election to receive hospice." 42 U.S.C. § 1395x(dd)(3)(A).

40.     Following the initial 90-day term, the hospice must obtain written certification of terminal illness from either a medical director or physician member of the hospice interdisciplinary group. *Id.* § 418.22.

41.     There is no limit to the duration of a patient's Medicare hospice benefit, but hospice eligibility periods consist of two initial 90-day periods and an unlimited number of subsequent 60-day periods. *See* 42 C.F.R. § 418.21.

42.     The federal government has repeatedly acknowledged that predicting life expectancy is not an "exact science." *See* CMS Program Memorandum AB- 03-040, March 28,

2003; 70 Fed. Reg. 70532, 70534 (Nov. 22, 2005) (expressly "recogniz[ing] that medical prognostications of life expectancy are not always exact").

43.     CMS has acknowledged that: "It is the physician's responsibility to assess the patient's medical condition and determine if the patient can be certified as terminally ill." 70 Fed. Reg. at 70539.

## B.     Medicare Payment for Hospice Care

44.     The United States reimburses Medicare providers with payments through CMS. CMS, in turn, contracts with Medicare Administrative Contractors ("MACs") to review, approve, and pay Medicare bills, called "claims," received from health care providers like Hospice Savannah. In practice, when medical providers, such as hospices, furnish services to a Medicare beneficiary, the providers thereafter submit a claim for reimbursement to a MAC. 42 U.S.C. § 1395ff(a)(2)(A). MACs are government contractors responsible for processing Medicare claims and making payments. 42 U.S.C. § 1395kk-1(a)(3). The MAC covering Hospice Savannah's Medicare reimbursement during the relevant time period was Palmetto GBA.

45.     Some claims that are initially paid by MACs are then subjected to an additional level of oversight. In a process known as "post-payment review," third-party contractors audit, and frequently reverse, MAC payment decisions. The post-payment review process has imposed significant burdens on the claim appeals process. The result of audits performed by one type of such contractor, known as a Zone Program Integrity Contractor ("ZPIC") are appealed through the Medicare claims appeals process.

46.     Even though the primary goal of ZPICs is to investigate and deter instances of suspected fraud, absent such findings, ZPICs may also identify improper payments that are then

referred to the MAC to request recovery of any overpayment. ZPICs have engaged in wide-ranging audits that often question the medical judgment of the hospices and the hospice patients' attending physicians, who generally are not affiliated with the hospice.

47.     Aggressive and widespread auditing activity by the ZPICs predictably has affected the number of provider appeals. In most circumstances, ZPICs use statistical sampling to calculate and project the amount of overpayments made on claims, which results in the findings from an audit of a small number of claims into a significantly larger overpayment amount. .

48.     ZPIC claim denials are frequently overturned on appeal. According to a report prepared by the Office of Inspector General of the Department of Health and Human Services, "ALJs reversed prior-level decisions by QICs [Qualified Independent Contractors (the entities that reconsider ZPICs' determinations)] and decided fully in favor of appellants in 56% of appeals in FY 2010." *See* Improvements Are Needed at the Administrative Law Judge Level of Medicare Appeals (OEI-02-10-00340), at 9 (Nov. 2012), available at http://oig.hhs.gov/oei/reports/oei-02-10-00340.pdf (last visited Sept. 15, 2015). Hospices succeed at the ALJ level approximately 70% of the time. The "fully favorable" rate for home health/hospice providers was 62%. *Id.* at 10. This does not include "partially favorable" decisions, nor does it include reversals of the ZPIC determination at the QIC level.

## C.      The Medicare Billing Dispute Appeals Process for Hospice Payments

49.     Appeals of post-payment claim denials are subject to a four-step process, set forth by statute. *See* 42 U.S.C. § 1395ff. The first two steps of the process are overseen by CMS; the third is overseen by OMHA; and the fourth is overseen by the Departmental Appeals Board ("DAB"). The steps are as follows:

a.      A denied claim is first presented to the MAC for redetermination. *Id.* §
1395ff(a)(3)(A). In cases of a ZPIC denial following an initial MAC approval, the hospice
presents the ZPIC-denied claim to the MAC that originally approved and paid the claim. The
MAC must render a redetermination decision within sixty days. *Id.* § 1395ff(a)(3)(C)(ii).

b.      If unsatisfied with the MAC's redetermination, a hospice can appeal the
MAC's decision to a Qualified Independent Contractor ("QIC") for reconsideration. *Id.* §
1395ff(c). QICs are tasked with independently reviewing the MAC's determination and must
render a decision within sixty days. *Id.* § 1395ff(c)(3)(C)(i).

c.      Provided that the amount in controversy is greater than $150 (for calendar
year 2015), a hospice may next request a hearing before an ALJ. *Id.* §§ 1395ff(b)(1)(E),
1395ff(d)(1)(A). Review by an ALJ is the first opportunity for independent review of a claim.
The ALJ is required both to hold a hearing and to render a decision within ninety days. *Id.*; 42
C.F.R. § 405.1016(a). When they have been granted the hearing required by law, this is the level
of the appeals process at which hospices typically have been able to obtain relief from adverse
ZPIC determinations.

d.      Finally, a hospice can appeal its claim to the DAB. *Id.* § 1395ff(d)(2); 42
C.F.R.§ 405.1108(a). In that event, the DAB conducts a *de novo* review of the ALJ decision and
either renders its own decision or remands to the ALJ for further proceedings. *Id.* In either event,
the DAB must act within ninety days. *Id.*

50.     There is also a separate "escalation" process applicable to the QIC, ALJ and DAB
levels of review.

a.      Specifically, if the QIC is unable to complete its review within sixty
calendar days, it must notify all parties that it cannot complete the reconsideration within the

statutory timeframe and offer the hospice the opportunity to "escalate" the appeal to an ALJ. 42 U.S.C. § 1395ff(c)(3)(C)(ii); 42 C.F.R. § 405.970. The QIC will continue the reconsideration process unless and until the hospice files a written escalation request. 42 C.F.R. § 405.970(c)(2).

b.     Similarly, if an ALJ has not held a hearing and rendered a decision within ninety days, a hospice may bypass the ALJ level by escalating its claim to the DAB. 42 U.S.C. § 1395ff(d)(3)(A). In such situations, the QIC's decision becomes the decision subject to DAB review. 42 C.F.R. § 405.1104; 42 C.F.R. § 405.1108(d). That means that if the hospice has previously escalated from the QIC, only the record before the MAC is available for review. The DAB may conduct additional proceedings, including a hearing, but (unlike at the ALJ level) is not required to do so. 42 C.F.R. § 405.1108. In fact, OMHA has explained that, in escalation situations, the DAB will "NOT hold a hearing or conduct oral argument unless there is an extraordinary question of law/policy/fact." OMHA Medicare Appellant Forum Presentation at 117          (Feb.          12,          2014),          *available          at* http://www.hhs.gov/omha/OMHA%20Medicare%20Appellant%20Forum/omha_medicare_appel lant_forum_presentations.pdf (last visited September 18, 2015) (hereinafter "OMHA Forum Presentation"). The DAB has 180 days in which to act on an escalation request, rather than its usual ninety. 42 C.F.R. § 405.1100(c)-(d).

c.     Likewise, if the DAB has not rendered a decision within ninety days on its review of an ALJ's decision, a hospice may bypass the DAB and seek judicial review. 42 U.S.C. § 1395ff(d)(3)(B); 42 C.F.R. § 405.1132. In cases of an initial escalation past the ALJ level, a hospice may escalate the appeal to federal court if the DAB fails to render a decision within 180 days. 42 C.F.R. § 405.1132; 42 C.F.R. § 405.1100(d). In the event of this "double escalation," the only agency decision available to the federal court for review is the QIC's decision, made

without a hearing. In the event of a "triple escalation" (from the QIC, from the ALJ, and from the DAB), only the MAC record is available for review.

**D.     The Delay In Obtaining an ALJ Hearing**

51.     The statutory time periods governing the appeals process provide for all levels of administrative review to be completed within about one year. In practice, however, the time it takes to pursue a claim appeal through HHS far exceeds the timeframes established by the Medicare Act.

52.     Enormous increases in the rates of appeal, in significant part by providers challenging inappropriate denials by over-zealous government contractors, including ZPICs, have caused a massive backlog at the ALJ level of the appeals process. In just two years (2012 and 2013), the backlog of ALJ-level appeals quintupled, growing from 92,000 to 460,000 pending claims. Ex. 1, Memorandum from Nancy J. Griswold, Office of Medicare Hearings & Appeals, Chief Admin. Law Judge, to OMHA Medicare Appellants (Dec. 24, 2013) ("Griswold Memorandum").

53.     The ALJs simply have not kept up with the prodigious and growing volume of appeals. The workload of OMHA's sixty-five ALJs increased by almost 300% from fiscal year 2012 to fiscal year 2013. *See* OMHA Forum Presentation at 16. In fiscal year 2013, of the 384,651 appeals that were filed, only 79,303 were decided – a meager twenty-one percent. OMHA Forum Presentation at 12 (reflecting decision figures); *Important Notice Regarding Adjudication Timeframes*, Office of Medicare Hearings and Appeals, U.S. Department of Health & Human Services, available at http://www.hhs.gov/omha/important_notice_regarding_adjudication_timeframes.html (last visited Sept. 18, 2015) ("*Important Notice*") (reflecting adjusted appeals receipts figures).

54.     Indeed, as of December 2013, appeals had languished for an average of sixteen months – approximately thirteen months longer than the ninety-day statutory deadline for a decision – before an ALJ even heard the case. OMHA Forum Presentation at 11; *see* Ex. 1 (Griswold Memorandum).

55.     The backlog of appeals, and concomitant delay in adjudication, has reached a crisis point. On December 24, 2013, OMHA's Chief ALJ, Nancy Griswold, announced that OMHA had suspended the assignment of all new provider appeals to ALJs, apparently as of July 15, 2013. Ex. 1 (Griswold Memorandum). The suspension is expected to last for a minimum of two years, with additional post-assignment hearing wait times expected to exceed six months when the suspension is eventually lifted. *Id.*

56.     The situation is getting only worse. OMHA received more than 15,000 appeals per week in February 2014. OMHA Forum Presentation at 53. OMHA has stated that it is currently projecting a twenty to twenty-four week delay even in docketing new appeals. *Important Notice.* From there, the new appeals will await assignment indefinitely, while the moratorium persists. As of February 12, 2014, 480,000 appeals were awaiting assignment to an ALJ. OMHA Forum Presentation at 57. And OMHA's self-imposed suspension in processing of appeals does not alter the requirement that a provider appeal an unfavorable QIC decision within sixty days, meaning that the backlog at the ALJ level will increase dramatically as appeals continue to roll in without being assigned or decided. *See* 42 U.S.C. § 1395ff(b)(1)(D)(ii); 42 C.F.R. § 405.1014(b)(1).

57.     The more than two-year moratorium on assignment of new appeals to an ALJ, taken together with the likely additional wait times for assignment even after the moratorium is lifted and the predicted wait times to obtain a hearing once a case is assigned to an ALJ, means

hospices lodging new appeals from the QIC to the ALJ can realistically expect to wait close to three years, and probably longer, even to obtain an ALJ hearing – let alone to receive a decision. *See Important Notice*; Ex. 1 (Griswold Memorandum).

## THE BILLING DISPUTE UNDERLYING THE THREATENED RECOUPMENT

58.     In 2014, a ZPIC named AdvanceMed requested medical records from Hospice Savannah as the beginning point for a review. This review stemmed from a single patient complaint and was not the result of AdvanceMed identifying any aberrant billing patterns for Hospice Savannah. In fact, Hospice Savannah was informed by Palmetto GBA that, because its billing and patient metrics are so optimal, it would not have been flagged for any review.

59.     By letter dated November 12, 2014, AdvanceMed outlined its post-payment review results and alleged overpayment determinations related to two separate, but related, record requests. The first set of claims reviewed by AdvanceMed involved thirty (30) claims and resulted in a 97% denial rate with a related overpayment determination of $111,525.46.

60.     The second set of claims reviewed was alleged to be a statistically valid random sample of claims involving one hundred (100) claims for 95 beneficiaries, all of whom at one point elected to receive hospice care from the Provider between January 1, 2011, and March 31, 2014. This review resulted in an alleged 38.9% error rate, and an alleged extrapolated overpayment determination of $10,747,842.60.

61.     AdvanceMed's review was based exclusively on a retroactive record review, without any communications with or input from the hospice physicians who had actually seen and treated the patients or the patients' own physicians who had certified and recertified the patients' need for hospice services.

62. All patients included in the AdvanceMed review had been referred by their own attending physicians, certified by their own attending physicians and a hospice medical director, and, upon consultation with their attending physicians, elected hospice—thereby giving up the right to Medicare payment for curative treatment with respect to their hospice diagnosis.

63. From this review of just 95 patients and an alleged collective overpayment for those patients of just approximately $152,000, AdvanceMed and Palmetto GBA used an unproven and non-peer-reviewed extrapolation methodology to inflate the alleged overpayment to over $10 million (a factor of over 70 times the alleged audited amount).

64. Hospice Savannah timely appealed AdvanceMed's denial of the claim at issue, as well as the statistical sampling and extrapolation through the redetermination and reconsideration levels of appeals, and received a final adverse Reconsideration decision dated July 15, 2015. As a result of certain reversals during the lower level administrative appeals, CMS now alleges an overpayment in the sample reviewed of $127,539.17, which it has extrapolated (using the same invalid methodology) to a demand of over $8.6 million.

65. Following the July 15, 2015 Maximus decision, Hospice Savannah spoke with Maximus's medical director, who indicated a willingness to review individual patient claims with Hospice Savannah's medical director. Hospice Savannah therefore submitted a request for reopening to Maximus. Maximus communicated with CMS and was foreclosed from allowing a reopening for this purpose and therefore denied Hospice Savannah's request.

66. On September 9, 2015, Hospice Savannah submitted a request for an ALJ hearing to challenge all of the individual medical necessity determinations as well as the statistical methodology employed by AdvanceMed and Palmetto GBA.

## **IRREPARABLE HARM**

67.     During the redetermination and reconsideration phases, Hospice Savannah was able to stay CMS's ability to engage in self-help recoupment and setoff measures by appealing on an accelerated timetable.

68.     CMS and Palmetto GBA have taken the position that, following the reconsideration decisions, and during the extended time period that Hospice Savannah awaits an ALJ hearing, they must begin engaging in self-help measures to recoup the alleged overpayments by taking 100% of Hospice Savannah's Medicare receivables (approximately $700,000 per month), even though CMS does not allege any impropriety with respect to the claims underlying these future payments.

69.     Medicare receivables constitute approximately 80% of Hospice Savannah's revenues. Hospice Savannah is not financially capable of surviving 100% recoupments of its Medicare receivables for a single month, let alone the three to five years it will take to finally receive the ALJ hearing and decision to which it is entitled. Hospice Savanna needs these revenues to fund its charitable mission of providing hospice services to terminally-ill patients and their families in the Savannah area. Without these revenues, Hospice Savannah will be forced out of business within a month; its patients and their families will be forced to attempt to find another hospice provider; and its employees will be forced to find new jobs. The harm to both Hospice Savannah and its patients and their families is therefore irreparable.

70.     In order to prevent being forced to close, Hospice Savannah has had personal meetings with Palmetto GBA and numerous calls and communications with CMS.

71.     Even though Hospice Savannah fully expects the ALJ to reverse all of the payment denials, Hospice Savannah has offered to enter into extended repayment schedules with payments to CMS of over $25,000 per month while Hospice Savannah awaits an ALJ hearing.

72. CMS's last proposal for an extended repayment schedule would have required monthly payments from Hospice Savannah as follows:

| Year 1 | $88,000 per month |
| Year 2 | $98,000 per month |
| Year 3 | $116,000 per month |
| Year 4 | $334,000 per month |

73. Hospice Savannah is not financially capable of making or surviving the Year 1 payment schedule proposed by CMS, much less the escalated payments in years 2 through 4. Moreover, given the backlog at the ALJ appeal level, it is unlikely that Hospice Savannah would receive a final ALJ decision by the end of year 4, which would leave it facing an even larger balloon payment, $1,900,000 for the remainder of any alleged debt owed to CMS.

74. Hospice Savannah's efforts at reaching a resolution and a stay of recoupment until it receives its opportunity for a full evidentiary hearing before an impartial ALJ have all been rejected.

75. CMS has insisted on recouping at 100% of Hospice Savannah's Medicare receivables or has demanded repayment schedules that are so far beyond Hospice Savannah's ability to pay that they too would put Hospice Savannah out of business within a month.

76. The government has not alleged that Hospice Savannah committed any fraud. Indeed, CMS and Palmetto have conceded that Hospice Savannah quality indicators are representative of an absence of any fraud.

77. The government has not alleged that any of the patients' certifying physicians did not believe (or could not have believed) that their patients were terminally ill or did not otherwise believe that hospice care was the best option for their patients. Also, there has been no allegation that any patient who elected hospice – thereby voluntarily electing to forgo curative treatment – made that election improperly.

78.     The government has not alleged any improper inducement was given to any physician.

79.     The government has not alleged that Hospice Savannah fabricated any certifications or any documentation.

80.     The government has not alleged that the hospice services were not provided as billed or that there were deficiencies or issues with the quality of the services provided.

81.     If CMS proceeds with its planned recoupment, Hospice Savannah will be forced to close within one month. Its terminally-ill patients and family members, most of whom are elderly and disabled, would be particularly adversely affected by the closure. They would need to find new hospice providers and would then need to become acclimated to new caregivers. As a result, many of these patients and their families would likely suffer anxiety and depression.

82.     It is doubtful that the other hospice providers in the Savannah area (all of which are for-profit) would be able to accommodate all of Hospice Savannah's patients. As a result, patients may have to leave their families and community and be placed elsewhere in the state or go without the hospice care that they have chosen and that their attending physicians have certified that they need.

83.     Hospice Savannah has approximately 21 patients who are receiving care in its Hospice House and who would need to be transferred to another non hospice inpatient facility, most likely a nursing home, since Hospice Savannah is the only hospice with a Hospice House.

84.     If forced to close, Hospice Savannah's 200 employees will be forced out of work as well.

85.     If Defendants are permitted to engage in a self-help recoupment process before Hospice Savannah has had the opportunity to challenge the underlying billing dispute before an

impartial ALJ, Hospice Savannah will be forced to go out of business almost immediately and certainly before any appeal can be completed.

86.     The billing dispute underlying the impending recoupment is being contested by Hospice Savannah through the administrative review process. Hospice Savannah is likely to prevail, in whole or in large part, once it has presented its case to an ALJ, which will be its first opportunity to have the billing dispute heard by an impartial and unbiased neutral.

87.     However, because Hospice Savannah will not receive the opportunity to present its case to an ALJ for at least three to five years, if recoupment is allowed to proceed in the meantime, the irreparable harm will occur before Hospice Savannah has received its first opportunity at meaningful review by an impartial and unbiased ALJ.

88.     Defendants' threatened recoupment constitutes a violation of the Administrative Procedures Act in that self-help recoupment under the circumstances—where the underlying basis of the billing dispute is dubious and unlikely to withstand scrutiny by an ALJ; where the backlog at the ALJ level will delay hearing for at least three to five years; and where the threatened recoupment would destroy Hospice Savannah before its first opportunity at impartial and unbiased review—and is arbitrary, capricious, or characterized by abuse of discretion, and the recoupment, if not enjoined, will result in prejudice to Hospice Savannah's substantial rights and threaten the health, welfare and safety of many of its patients.

89.     Hospice Savannah has no adequate remedy at law, and seeks only to preserve the status quo pending the outcome of a hearing before an ALJ. Hospice Savannah therefore seeks a Temporary Restraining Order and an injunction preventing the Defendants from recouping from Hospice Savannah's Medicare payments prior to a decision from an unbiased and impartial ALJ on the merits of the billing dispute.

90.    If immediate injunctive relief is not issued, Hospice Savannah and its patients and their families will suffer immediate and irreparable harm, including, but not limited to: (i) physical and mental deterioration of many of Hospice Savannah's patients because Hospice Savannah will be forced to close its doors, and its terminally-ill patients and their families will be forced to attempt to locate alternative hospice placement during a very difficult time in their lives; (ii) loss of Hospice Savannah's ability to carry on its charitable mission of providing hospice services to terminally ill members of the Savannah area; and (iii) loss of goodwill and business reputation. In short, if the Defendants' threatened recoupment is not enjoined, Hospice Savannah will lose its economic viability because it will lose 80% of its revenues, and consequently, will be forced to close its doors within a month.

91.    Under these circumstances, the administrative appeal provided by 42 C.F.R. §§ 405.1000, et seq. does not afford an adequate remedy at law because recoupment would force Hospice Savannah to close long before it could ever receive an ALJ hearing. The three to five year backlog for an ALJ hearing ensures that Hospice Savannah and its residents will be denied any effective relief even though there is substantial reason to believe that the underlying billing dispute supporting the recoupment would ultimately be resolved in Hospice Savannah's favor.

92.    Hospice Savannah's Medicare payments, its legitimate expectations for receipt of Medicare payments for services provided to terminally ill Medicare beneficiaries, and its interest in engaging in the hospice business and maintaining the goodwill associated therewith, constitute valuable property and liberty rights and interests within the meaning and protection of the Due Process Clause of the Fifth Amendment to the United States Constitution.

93.    Defendants should be enjoined from recouping from Hospice Savannah's Medicare payments based on a billing dispute on which Hospice Savannah is highly likely to

prevail and forcing Hospice Savannah out of business and subjecting its patients and their families to irreparable harm by forcing them to try to locate other hospice services.

## COUNT ONE
## PROCEDURAL DUE PROCESS

94. The allegations contained in paragraphs 1 through 93 herein above are incorporated by reference as if fully set out herein.

95. The procedures utilized by CMS to recoup substantial and dubious alleged overpayments from Hospice Savannah based on the determinations of entities that an established track record of overstating overpayments (70% of the time), when Hospice Savannah has a substantial likelihood of success in overturning the medical necessity determinations and statistical methodologies underlying the alleged overpayment determinations, are constitutionally inadequate, because they force Hospice Savannah to incur a devastating loss that will prevent it from ever accessing the appeals process.

96. To satisfy the requirements of due process, the Secretary must provide a hospice with an administrative hearing and an opportunity to challenge the overpayment determinations before a fair and impartial decision maker before imposing a self-help recoupment remedy that would force Hospice Savannah out of business, at least where, as here, the hospice has demonstrated significant reason to doubt the validity of the alleged overpayment determinations underlying the threatened recoupment.

97. Defendants are threatening to deprive Hospice Savannah of its property and liberty interests in or associated with its Medicare payments and hospice business and goodwill without due process of law, in violation of the Fifth Amendment of the United States Constitution and other applicable law. Such action threatens to cause irreparable harm to Hospice

Savannah and its residents. The issuance of injunctive relief prohibiting such recoupment until such due process has been had will not harm the defendants and is in the public interest.

**COUNT TWO**
**SUBSTANTIVE DUE PROCESS**

98.     The allegations contained in paragraphs 1 through 97 herein above are incorporated by reference as if fully set out herein.

99.     It would be a clear abuse of discretion, and arbitrary and capricious action, for Defendants to withhold Hospice Savannah's Medicare payments pending a hearing before an ALJ under the circumstances of this case. For the Government to force a hospice provider out of business on the basis of a billing dispute that is premised on determinations and statistical extrapolation created by an entity with an established track record of overstating overpayments, and where Hospice Savannah has demonstrated a likelihood of reversing those determinations and the extrapolation at an Administrate Law Judge hearing, would be irrational.

100.    Defendants' arbitrary and capricious decision to recoup 100% of Hospice Savannah's Medicare payments and to drive it out of business under the circumstances of this case deprives Hospice Savannah of its liberty and property interests, in violation of due process under the Fifth Amendment to the United States Constitution and other applicable laws. Such action threatens to cause irreparable harm to Hospice Savannah and its patients and their families. The issuance of injunctive relief prohibiting such recoupment will not harm the Defendants and is in the public interest.

**COUNT THREE**
**ULTRA VIRES**

101.    The allegations contained in paragraphs 1 through 100 herein above are incorporated by reference as if fully set out herein.

102.    Defendants are required to provide Hospice Savannah with an ALJ hearing and decision within 90 days. 42 U.S.C. § 1395ff(d)(1)(A); 42 C.F.R. § 405.1016(a).

103.    Defendants are threatening to recoup from Hospice Savannah's Medicare payments even though they cannot and will not provide the ALJ hearing in the required time frame. The Court should enjoin Defendants from engaging in such ultra vires actions against Hospice Savannah, which actions are contrary to the limitations on the Defendants' authority as set forth in the Medicare Act.

## COUNT FOUR
## PRESERVATION OF STATUS OF RIGHTS UNDER SECTION 705 OF THE APA

104.    The allegations contained in paragraphs 1 through 103 herein above are incorporated by reference as if fully set out herein.

105.    In relevant part, the Administrative Procedure Act provides that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

106.    This Court is a "reviewing court" and a "court to which a case may be taken on appeal." 42 U.S.C. §§ 405(g), 1395ii.

107.    As outlined above, Hospice Savannah has meritorious challenges to the billing dispute underlying the threatened recoupment from Medicare payments, and will vigorously assert its arguments during the administrative appeals process that has already been initiated as promptly and expeditiously as the ALJ can accommodate. In the meantime, if immediate injunctive relief is not granted "to preserve status or rights pending conclusion of the review

proceedings," however, Hospice Savannah's right to judicial review in this Court will be eliminated by the inability of Hospice Savannah to remain in existence due to the crippling effect of recouping from Hospice Savannah's Medicare payments. Furthermore, Hospice Savannah's patients and employees will suffer irreparable harm in the absence of an injunction.

108. Accordingly, pursuant to 5 U.S.C. § 705, issuance of the injunctive relief sought in this case is necessary and appropriate in order to prevent irreparable injury and to preserve the Court's jurisdiction to review the result of the administrative appeals process related to the billing dispute.

## INJUNCTIVE RELIEF

109. The allegations contained in paragraphs 1 through 108 herein above are incorporated by reference as if fully set out herein.

110. Defendants' intent to recoup 100% of Hospice Savannah's Medicare payments will cause Hospice Savannah to go out of business imminently, even before it has a chance to participate in an ALJ hearing.

111. The closure of Hospice Savannah will force Hospice Savannah's patients and their families to locate alternative hospice services during one of the most difficult periods in their lives.

112. Hospice Savannah's closure would not only cause it severe and irreparable harm, but would also harm many of the more than 200 full-time and part-time employees of Hospice Savannah who would undoubtedly lose their livelihoods.

113. The threat of irreparable harm to Hospice Savannah and to its terminally-ill patients and their families far outweighs any harm Defendants might suffer if injunctive relief is granted. In fact, the Defendants will not be harmed in any perceptible way by maintaining the status quo.

114.    If injunctive relief is not granted, Hospice Savannah will be forced out of business almost immediately regardless of the merits of the billing dispute underlying the threatened recoupment. If injunctive relief is granted, Hospice Savannah's fate will be tied to the merits of its administrative challenge to the underlying billing dispute. If the result of the administrative process favors Hospice Savannah, the injunctive relief sought will have avoided Hospice Savannah's unnecessary closure and protected Hospice Savannah's terminally-ill patients and their families. The value of injunctive relief to Hospice Savannah is high.

115.    If injunctive relief is granted and the result of the administrative process favors the Defendants, the only arguable harm to Defendants will be that recoupment will have been delayed until after a hearing before an ALJ. Inasmuch as a premature recoupment would almost immediately force Hospice Savannah out of business (thereby ending Medicare payments available for recoupment), there is little to no benefit to Defendants of immediately recouping Medicare payments as opposed to beginning recoupment after the hearing before an ALJ when the status of the billing dispute has been determined. The potential that Defendants will suffer any harm if injunctive relief is granted is speculative and negligible, and the amount of any harm, if any, would be minimal.

116.    There is a strong likelihood that Hospice Savannah will prevail on the merits of the billing dispute. The success rate for home health and hospice providers in billing disputes at the ALJ level is a staggering 70%, including "fully favorable" (62%) and "partially favorable" decisions. In this case, all of the services at issue were provided pursuant to appropriate certifications and re-certifications made by each patient's attending physician and Hospice Savannah's physician medical director. Moreover, the purported sampling methodology, upon which Defendants rely to stretch an alleged $127,539.17 overpayment into a demand for over

30

$8,600,000, is based on junk science that has major flaws and that has not been peer-reviewed. For these reasons, it is highly likely that Hospice Savannah will prevail in overturning all or most of Defendants' determinations with respect to the medical necessity of the specific hospice services under review and will also prevail in invalidating the purported extrapolation.

117.    The injunctive relief requested by Hospice Savannah will not adversely affect the public interest. The public interest is in no way served by an unwarranted and accelerated shut down of a not for profit hospice provider that provides hospice services to terminally-ill patients and their families based upon a billing dispute that—if the administrative and judicial review processes are permitted to run their course—will most likely be resolved in favor of the hospice.

118.    Based upon the irreparable harm demonstrated above, pursuant to Rule 65, FRCP, a temporary restraining order should be issued enjoining Defendants from recouping Hospice Savannah's Medicare payments until such time that a hearing can be held on Hospice Savannah's Request for a preliminary injunction pursuant to Rule 65, FRCP.

119.    Based upon the irreparable harm demonstrated above, a preliminary injunction and permanent injunction should be issued enjoining Defendants from recouping from Hospice Savannah's Medicare payments prior to providing Hospice Savannah with a hearing before an impartial and unbiased ALJ.

WHEREFORE, Hospice Savannah prays for the following relief:

a.    That the Court issue a Temporary Restraining Order pursuant to Rule 65(c) prohibiting the Defendants from recouping from Hospice Savannah's Medicare payments prior to completion of the administrative process, upon such security bond, if any, as the court determines reasonable;

b. That the Court order Defendants to appear within ten days to show cause why said Temporary Restraining Order should not remain in effect as a preliminary injunction pending the exhaustion of the administrative remedies; and

c. That the Court issue a preliminary and permanent injunction prohibiting the Defendants from recouping from Hospice Savannah's Medicare payments prior to completion of the administrative process, upon such security bond, if any, as the court determines reasonable.

Respectfully submitted,

ARNALL GOLDEN GREGORY LLP

**/s/ Jason E. Bring**
Jason E. Bring
Georgia Bar No. 082498

171 17th Street, N.W.
Suite 2100
Atlanta, Georgia 30363-1031
Phone: 404.873.8162
Fax: 404.873.8163
jason.bring@agg.com

Patrick T. O'Connor
Georgia Bar No. 548425
Paul H. Threlkeld
Georgia Bar No. 710731
OLIVER MANER LLP
PO Box 10186
Savannah, Georgia 31412
(912) 236-3311
pto@olivermaner.com
pht@olivermaner.com

*Attorneys for Plaintiff Hospice Savannah, Inc.*

**EXHIBIT 1**

Memorandum from Nancy J. Griswold, Office of Medicare Hearings & Appeals, Chief Admin.
Law Judge, to OMHA Medicare Appellants (Dec. 24, 2013)



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**     Office of the Secretary

Office of Medicare Hearings and Appeals
Office of the Chief Judge
1700 North Moore Street, Suite 1800
Arlington, VA 22209
(703) 235-0635 Main Line
(703) 235-0700 Facsimile

DEC 2 4 2013

## Memorandum to OMHA Medicare Appellants

Re: Administrative Law Judge Hearings for Medicare Claim and Entitlement Appeals

Based on a number of recent inquiries regarding delays in the processing of Medicare claim and entitlement appeals, I want to apprise you of some recent operational changes that may impact your interaction with the Office of Medicare Hearings and Appeals (OMHA). You have been chosen to receive this letter because you have a significant number of Medicare appeals currently pending before OMHA.

Due to the rapid and overwhelming increase in claim appeals, effective July 15, 2013, OMHA temporarily suspended the assignment of most new requests for an Administrative Law Judge hearing to allow OMHA to adjudicate appeals involving almost 357,000 claims for Medicare services and entitlements already assigned to its 65 Administrative Law Judges. This temporary measure was necessitated by a dramatic increase in the number of decisions being appealed to OMHA, the third level of administrative review in the Medicare claim and entitlement appeals process.

From 2010 to 2013, OMHA's claims and entitlement workload grew by 184% while the resources to adjudicate the appeals remained relatively constant, and more recently were reduced due to budgetary sequestration. Even with increased productivity from our dedicated Administrative Law Judges and their support staff, we have been unable to keep pace with the exponential growth in requests for hearing. Consequently, a substantial backlog in the number of cases pending an ALJ hearing, as well as cases pending assignment has resulted.

In just under two years, the OMHA backlog has grown from pending appeals involving 92,000 claims for services and entitlement to appeals involving over 460,000 claims for services and entitlement, and the receipt level of new appeals is continuing to rise. In January 2012, the number of weekly receipts in our Central Operations Division averaged around 1,250. This past month, the number of receipts was over 15,000 per week. Due to this rapidly increasing workload, OMHA's average wait time for a hearing before an Administrative Law Judge has risen to 16 months and is expected to continue to increase as the backlog grows.

Although assignment of most new requests for hearing will be temporarily suspended, OMHA will continue to assign and process requests filed directly by Medicare beneficiaries, to ensure their health and safety is protected. Assignment of all other new requests for hearing will resume as Administrative Law Judges are able to accommodate additional workload on their dockets. However, with the current backlog we do not expect general assignments to resume for at least 24 months and we expect post-assignment hearing wait times will continue to exceed 6 *months.*

We remain committed to providing a forum for the fair and timely adjudication of Medicare claim and entitlement appeals; however, we are facing significant challenges which reduce our ability to meet the timeliness component of our mission. To address this challenge, OMHA is working closely with our colleagues within the Centers for Medicare and Medicaid Services (CMS) and the Departmental Appeals Board (DAB). We are committed to finding new ways to work smartly and more efficiently, in order to better utilize resources to address the increased demand for hearings.

In order to keep you apprised concerning our workload and to facilitate your interaction with OMHA, we will host an OMHA Medicare Appellant Forum on February 12, 2014, from 10:00 am to 5:00 pm. The event will take place in the Wilbur J. Cohen building located at 330 Independence Ave. SW, Washington DC 20024. The purpose of this event is to provide further information to OMHA appellants and providers on a number of initiatives underway and to provide information on measures we can take to make the appeals process work more efficiently. You can obtain further information and register for the event by visiting the OMHA website; http://www.hhs.gov/omha/index.html. We are pleased to offer this opportunity and hope you will be able to join us.

Although we know that this information will not alleviate your concerns with regard to delays in processing appeals, we hope that we have at least provided a backdrop for the environment in which OMHA currently processes appeals. We ask for your indulgence as we work to address these challenges and thank you in advance for your patience as we continue our efforts to serve the Medicare appellant and beneficiary communities. For additional information and updates on OMHA's adjudication timeframes, or to register for our OMHA Medicare Appellant Forum, please visit the OMHA website at: http://www.hhs.gov/omha/index.html.

Sincerely,

Nancy J. Griswold
Chief Administrative Law Judge

## VERIFICATION

I, Debra Larson, the CEO & President of Hospice Savannah, Inc., hereby declare under penalty of perjury that I have read the foregoing Verified Complaint for Injunctive Relief and Mandamus, that the factual statements contained therein are true to the best of my knowledge except those based upon information and belief, as to which I believe such matters to be true.

Executed this 18th day of September, 2015.

Debra Anthony Larson

## CERTIFICATE OF SERVICE

This is to certify that a true and accurate copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic filing. Parties may access this filing through the Court's CM/ECF System.

Date: September 18, 2015

/s/ **Jason E. Bring**
Jason E. Bring